**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

JAMES RAYNOR,
*Plaintiff*,

v.

MATTHEW MCLAUGHLIN,
*Defendant*.

CASE NO. 3:24-cv-01221 (KAD)

**October 1, 2026**

**MEMORANDUM OF DECISION**
**RE: DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (ECF NO. 71)**

Kari A. Dooley, United States District Judge:

Plaintiff James Raynor, a sentenced inmate in the custody of the Connecticut Department of Correction ("DOC"), commenced this civil rights action *pro se* under 42 U.S.C. § 1983, alleging violations of his constitutional rights while he was housed at Garner Correctional Institution ("Garner"). Compl., ECF No. 1. Before the Court are Defendant's Motion for Summary Judgment, ECF No. 71 [hereinafter "Mot."], and supporting memorandum, Mem. Law Supp. Def.'s Mot. Summ. J., ECF No. 71-1 [hereinafter "Mot. Br."]. Plaintiff opposes the Motion. *See* Pl.'s Mem. Law Opp. Def.'s Mot. Summ. J., ECF No. 74 [hereinafter "Pl.'s Opp."]. For the reasons set forth below, Defendant's Motion for Summary Judgment is **GRANTED**.

**Legal Standard**

The standard under which courts review motions for summary judgment is well established. "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it "might affect the outcome of the suit under the governing law," while a dispute about a material fact is "genuine" if "the evidence is such that a reasonable

jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

Significantly, the inquiry being conducted by the court when reviewing a motion for summary judgment focuses on "whether there is the need for a trial — whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson*, 477 U.S. at 250. Where, as here, the burden at trial would rest on the non-movant, " the party moving for summary judgment may satisfy his burden of production … (1) by submitting evidence that negates an essential element of the non-moving party's claim, or (2) by demonstrating that the non-moving party's evidence is insufficient to establish an essential element of the non-moving party's claim." *Nick's Garage, Inc. v. Progressive Cas. Ins. Co.*, 875 F.3d 107, 114 (2d Cir. 2017) (quoting *Farid v. Smith*, 850 F.2d 917, 924 (2d Cir. 1988)).

Once the movant meets his burden, the nonmoving party "must set forth 'specific facts' demonstrating that there is 'a genuine issue for trial.'" *Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009) (quoting Fed. R. Civ. P. 56(e)). "[T]he party opposing summary judgment may not merely rest on the allegations or denials of his pleading" to establish the existence of a disputed fact. *Id.*; *accord Lujan v. Nat'l Wildlife Fed'n,* 497 U.S. 871, 888 (1990). "[M]ere speculation or conjecture as to the true nature of the facts" will not suffice. *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (citations omitted; internal quotation marks omitted). Nor will wholly implausible claims or bald assertions that are unsupported by evidence. *See Carey v. Crescenzi*, 923 F.2d 18, 21 (2d Cir. 1991); *Argus Inc. v. Eastman Kodak Co.*, 801 F.2d 38, 45 (2d Cir. 1986). "[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to

return a verdict for that party. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249–50 (citations omitted).

In determining whether there exists a genuine dispute as to a material fact, the Court is "required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." *Johnson v. Killian*, 680 F.3d 234, 236 (2d Cir. 2012) (quoting *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003)). "In deciding a motion for summary judgment, the district court's function is not to weigh the evidence or resolve issues of fact; it is confined to deciding whether a rational juror could find in favor of the non-moving party." *Lucente v. Int'l Bus. Machines Corp.*, 310 F.3d 243, 254 (2d Cir. 2002).

**Facts**

The relevant facts are taken from the parties' respective Local Rule 56(a)(1) statements and attached exhibits. All the facts set forth herein are undisputed unless otherwise indicated.[1]

At all relevant times, Plaintiff was in the custody of the DOC. SUMF ¶ 1. Defendant is employed by DOC and has been assigned to Garner, a correctional facility in Newtown, Connecticut, since 2010. *Id.* ¶ 3–5. On February 20, 2024, Defendant was informed by his supervisors that Garner would undergo a general facility search, to include a "shakedown" of the Alpha Unit. *Id.* ¶ 7. The Alpha Unit is the only general population housing unit at Garner. *Id.* ¶ 6.

DOC Administrative Directive 6.7 defines a general facility search as a "planned and systematic search of all areas within and around a correctional facility, including the grounds, parking areas, and employee offices and work areas." SUMF ¶ 10. A general facility search

---

[1] Where the facts are not disputed, the Court generally cites only to Defendant's Local Rule 56(a)(1) Statement of Undisputed Material Facts, ECF No. 71-2 [hereinafter "SUMF"]. To the extent Plaintiff submitted supplementary facts which are relevant to the Court's analysis, the Court cites to Plaintiff's Opposition Brief.

conducted within a housing unit is commonly called a shakedown. *Id.* ¶ 11. Shakedowns are conducted for safety and security reasons to look for weapons, drugs, and any kind of contraband, which are items that are out of compliance with the facility's directives for property allowance. *Id.*

During shakedowns, a number of inmates can be out of their cells at the same time, and the inmates may become agitated, upset, or angry because their personal possessions are being searched outside of their presence. SUMF ¶ 12. Shakedowns can be potentially volatile situations, which require inmates to be strictly controlled. *Id.* ¶¶ 12–13. There have been incidents during shakedowns at Garner during which inmates have assaulted other inmates and staff. *Id.*[2]

Since at least 2015, and on February 20, 2024, Garner personnel sometimes employed a policy in which they handcuffed inmates behind their backs during general facility searches. SUMF ¶ 14; Pl.'s Opp. 22.[3] The reason for this protocol was to ensure less mobility and to

---

[2] In an effort to dispute Defendant's characterization of shakedowns as "potentially volatile situations" in which individuals have been assault, Plaintiff submits multiple declarations from other inmates stating that they had never witnessed violence against any other inmates or staff during the shakedowns. *See* Pl.'s Opp. 21; *see also id.* at 68–69, 71, 74. However, while the inmates deny having personally observed such conduct while they were at Garner, their lack of personal observation is insufficient to create a general dispute as to whether such incidents took place.

[3] While Defendant states that handcuffing inmates behind their backs was the "standard protocol" during a shakedown, *see* SUMF ¶ 14, Plaintiff contends that the policy in place on February 20, 2024, concerning the use of restraints did not require inmates to be handcuffed behind their backs, or even handcuffed, during shakedowns, *see* Pl.'s Opp. 22–23. In support of this claim, Plaintiff sets forth a copy of the shakedown policy as set forth in a February 20, 2024 memorandum from Deputy Warden Thomas Kenny ("Warden Kenny"), which does not include any language directing that inmates be handcuffed while a shakedown of their cell is completed. *See id.* at 54. However, in support of its Motion Defendant submitted another copy of the shakedown policy, bearing the same date, which provided that:

> [a]ll inmates will be strip searched in their respective cells and then escorted to the multi-purpose room. **They will be handcuffed and secured in the multi-purpose room until their cell is completed.** During this time, all inmates will remain standing and facing the wall in an orderly fashion. Inmates will not be permitted to communicate with each other during this time. Once the cell search is completed, the inmates will be escorted back to their assigned cell.

ECF No. 71-3 at 21 (emphasis added). Plaintiff also submits email correspondence, dated March 4, 2024, in which Warden Kenny attached an "updated operational plan for the general facility search" and directed that hand restraints generally would "not be utilized while the inmates are escorted from their cells to the multi-purpose room." *See id.* at 57.

As an initial matter, the Court does not find that March 4, 2024 email creates a genuine dispute as to the operational plan in place nearly two weeks prior. As for the discrepancies between the two memoranda submitted, the Court need not determine which copy of the memorandum was in effect on February 20, 2024. In any event, neither memorandum prohibited the use of hand restraints and Defendant has submitted sufficient evidence to support his contention that Garner restrained inmates' hands behind their backs during shakedowns. *See* Mot. Ex. 2, Decl. Deputy

minimize risk to other inmates and DOC staff during the shakedown, as well as to serve as a safety precaution by ensuring that no inmate would be handcuffed around any inmate who was not handcuffed. SUMF ¶ 14.

As part of the general facility search that began on February 20, 2024, all inmates were strip searched in their respective cells and then escorted to the multi-purpose room, where they were handcuffed and secured until searches of their cells were completed. SUMF ¶ 18. During this time, all inmates were to remain standing and facing the wall in an orderly fashion and were not permitted to communicate with each other. *Id*. Once the cell search was completed, the inmates were to be escorted back to their assigned cells. *Id*.

On February 20, 2024, Plaintiff was housed in cell #110 of the Alpha Unit at Garner. SUMF ¶ 6, 20. Defendant was assigned as a "shakedown" supervisor in the Alpha Unit during the facility shakedown that began that day. *Id.* ¶ 8. At approximately 1:30 p.m., Defendant reported to the Alpha Unit in furtherance of direct orders to search every cell and person on the Unit in order to locate and remove contraband in accordance with facility procedures governing general facility searches. *Id*. ¶ 9. Plaintiff, as well as cell #110, were searched in accordance with DOC Administrative Directive 6.7 and Garner's Annual Shakedown Plan. *Id*. ¶ 21.

Plaintiff has a history of chronic injury to his right elbow as a child, namely, an unspecified fracture of the lower end of the right humerus with subsequent encounter for fracture with

---

Warden Thomas Kenny ¶ 14, ECF No. 71-4; *see also* Mot. Ex. 1, Decl. Matthew McLaughlin ¶ 33–34, ECF No. 71-3 [hereinafter "McLaughlin Decl."]. Indeed, Plaintiff testified during his deposition that he had been handcuffed in the past during shakedowns, *see* Mot. Ex. 4, Dep. James Raynor 203:17-204:12, ECF No. 71-6 [hereinafter "Raynor Dep."], and submitted declarations from other inmates in which establish that Garner personnel sometimes handcuffed inmates with their hands secured behind their backs during shakedowns. *See* Pl.'s Opp. 67, 69, 71, 75–76. Accordingly, resolving these evidentiary discrepancies in Plaintiff's favor, the Court finds the evidence shows that Garner personnel sometimes employed a policy in which they handcuffed inmates behind their backs during general facility searches.

malunion. SUMF ¶ 2. He also has a history of ulnar nerve neuropathy on the right side and underwent ulnar nerve decompression in 2020. *Id.*

During the shakedown on February 20, 2024, Defendant was responsible for ensuring inmates were handcuffed behind their backs and observed Plaintiff being handcuffed by another correctional officer. SUMF ¶ 22. Defendant intervened to ensure that Plaintiff would be handcuffed behind his back. *Id.* During this interaction, Plaintiff informed Defendant he had a shoulder injury. *Id.* ¶ 23. Plaintiff made it explicitly clear to Defendant that he suffered from a pre-existing injury to his right arm, specifically, an unhealed fracture to his elbow. Pl.'s Opp. 26. He also explained that he suffered from chronic nerve pain and had a limited range of motion in his right arm, and he physically demonstrated his arm limitation. *Id.* Plaintiff also told Defendant that he had a prior ulnar nerve decompression surgery on the elbow of his right arm, and he showed Defendant the scar on his right elbow where he had the surgery and deformity of his right arm. *Id.*

At the time of the shakedown, Defendant did not have access to inmates' medical records, SUMF ¶ 25, and Plaintiff did not have a written medical pass signed by a doctor to be handcuffed in the front, *id.* ¶ 24.

Defendant agreed to allow Plaintiff to be "double-cuffed" – in other words, secured using two sets of handcuffs – behind his back, so that Plaintiff would have more room between his hands and shoulders and be more comfortable while he was in the multi-purpose room. SUMF ¶ 26. After Plaintiff was handcuffed, he was escorted to the multi-purpose room. *Id.* ¶ 27. Plaintiff remained in the multi-purpose room for at least one hour or more. *See* Pl.'s Opp. 28.[4]

---

[4] Defendant submits that Plaintiff remained in the multi-purpose room for one hour while his cell was searched. SUMF ¶ 27. However, Plaintiff's contention that he remained in the multi-purpose room for more than one hour, *see* Pl.'s Opp. 28, places the fact in dispute, as it is sufficiently supported by deposition testimony that he was in the multi-purpose room "anywhere between an hour or more," *see* Raynor Dep. 144:5-19. For the purposes of this Motion, the Court will resolve the factual inconsistencies in Plaintiff's favor. *See Nationwide Life Ins. Co. v. Bankers Leasing Ass'n, Inc.*, 182 F.3d 157, 160 (2d Cir. 1999).

While Plaintiff was in the multi-purpose room, he continued to experience discomfort. *See* Pl.'s Opp. 24, 29. Due to the pain, he requested to be seen by medical personnel, to have his handcuffs removed, and to have Defendant be notified. *See id.* However, he was told numerous times that neither Defendant nor medical staff were available. *See id.* at 24. During the period of time in which Plaintiff was in the multi-purpose room, Defendant was not alerted that Plaintiff was in pain. *See* McLaughlin Decl. ¶ 29; *see also* SUMF ¶ 28.[5]

After he was returned to his cell, Plaintiff asked Defendant to see a medical professional. *See* SUMF ¶ 29. He was seen by a nurse within five to ten minutes of making his request. *Id.* ¶ 30.[6] The nurse provided Plaintiff with ice after visually assessing that Plaintiff's arms were red and after Plaintiff informed the nurse that he was experiencing pain. *Id.* at 30.[7] The nurse

---

[5] Defendant's SUMF broadly states that Defendant "was at no point alerted by anyone that the Plaintiff was in any pain." *See* SUMF ¶ 28. Plaintiff appears to deny this contention. *See* Pl.'s Opp. 29. The Court finds that Plaintiff has sufficiently disputed Defendant's contention in part.

Defendant's cited evidence only supports the contention that he was not alerted that Plaintiff was in pain while Plaintiff was in the multi-purpose room. *See* McLaughlin Decl. ¶ 29. And, as Plaintiff indicates, the record reflects that Defendant was made aware of Plaintiff's discomfort "[p]rior to the application of the handcuffs" and after Plaintiff was returned to his cell. *See* Pl.'s Opp. 29. Accordingly, Defendant has submitted sufficient evidence that he was not alerted that Defendant was in pain *during period of time in which Plaintiff was in the multi-purpose room*.

[6] In his SUMF, Defendant states that "[a]pproximately five to ten minutes after [Plaintiff] asked [Defendant] to see a medical professional the Plaintiff was seen by a unit nurse." *See* SUMF ¶ 30. In his counterstatement of material facts, Plaintiff "denies" that he was seen by a unit nurse approximately five to ten minutes after asking Defendant for medical aid. *See* Pl.'s Opp. 29–30. However, in explaining his denial, he first disputes that the nurse assigned was a "unit nurse," as Defendant's SUMF indicated that there was no full-time nurse assigned to the unit. *Id.* Second, he states he "was not promptly given aid" as "he requested to be seen by medical multiple times due to the pain he was in for over an hour." *Id.* As to Plaintiff's first argument, the Court finds the specifics of the nurse's assignment or title are immaterial to its analysis below. Insofar as Plaintiff contends that he was not promptly given aid, such a response does not challenge the factual substance described in the relevant portion of Defendant's SUMF. Accordingly, the Court does not consider the contentions to have created a dispute created a dispute of fact. *See Alvarado v. United Hospice, Inc.*, 631 F. Supp. 3d 89, 97 (S.D.N.Y. 2022) (collecting cases) (holding where parties "identify disputed facts but with semantic objections only or by asserting irrelevant facts, ... which do not actually challenge the factual substance described in the relevant paragraphs, the Court will not consider them as creating disputes of fact").

[7] Defendant's SUMF asserts "[t]here was no edema or discoloration and no redness or marking on the Plaintiff's wrists" and the "unit nurse provided Plaintiff with two (2) tablets of 200 mg of ibuprofen as needed for three days, as well as ice." *See* SUMF ¶ 31. Citing his deposition testimony, Plaintiff states the nurse provided him an ice pack "due to her visual assessment of [Plaintiff]" and "had him orally take 600 mg of Motrin in her presence, then provided [him] a thirty pack of Tylenol for subsequent use for pain and provided ice also for the pain and swelling she observed." *See* Pl.'s Opp. 30. This assertion is generally supported by Plaintiff's testimony. *See also id.* at 134, 156–157. Insofar as it is relevant to the Court's analysis, the Court resolves the factual dispute in Plaintiff's favor. *See Nationwide Life Ins.*, 182 F.3d at 160.

instructed Plaintiff to take 600 milligrams of Motrin in her presence and provided him with ice and a thirty pack of Tylenol for future use. *Id.*

The next day, on February 21, 2024, Dr. Valetta, the DOC physician assigned to Garner, asked a registered nurse to evaluate Plaintiff after he reported pain in his right hand, wrist, elbow, and shoulder, as well as tingling and numbness in his hand. SUMF ¶ 32. The planned course of treatment was for Plaintiff to continue to use Motrin and an ice pack for three days. *Id.*

On March 15, 2024, Plaintiff was transported to the University of Connecticut Health Center ("UCHC") for further evaluation. SUMF ¶ 33. Dr. Ian Wellington of UCHC's Department of Orthopedic Surgery determined Plaintiff had a previous closed fracture on the right elbow which healed with either a malunion or fibrous non-union. *See* SUMF 34; Pl.'s Opp. 31; Pl.'s Med. Recs. 19–20, ECF No. 70. Dr Wellington documented that while Plaintiff's "recent exacerbation [wa]s certainly from this prolonged handcuffing, his chronic pain is likely secondary to the lack of healing at the fracture site or from evaluating." Pl.'s Med. Recs. 20. Dr. Wellington also documented that "[t]he past 2 weeks have been more painful after an acute exacerbation after handcuffed behind his back" and that he "would recommend continued anti-inflammatory medication given his acute inflammation[,] [and that] the patient not be handcuffed behind his back and rather should be handcuffed in front of his body which is more physiologically amenable to the state of his elbow." *Id.*

Plaintiff's issues are chronic, as there has been no success from a previous surgery. SUMF ¶ 36. As a result of being held in handcuffs for a prolonged period, Plaintiff continues to suffer from a limited range of movement and an increased level of pain. *Id.* at 37–38.[8]

[8] While Defendant denies that the handcuffing resulted in long-term pain, the Court finds the evidence submitted by Plaintiff is sufficient to place the matter in dispute. *See* Opp. Br. 80–81. Accordingly, the Court resolves the factual dispute in Plaintiff's favor. *See Nationwide Life Ins.*, 182 F.3d at 160.

**Procedural History**

In his Complaint, Plaintiff brought several constitutional claims against Defendant Lieutenant McLaughlin, as well as Warden Maldonado. *See* Compl. Following initial review of the Complaint pursuant to 28 U.S.C. § 1915A, the Court allowed Plaintiff's individual capacity claims to proceed against Defendant Lieutenant McLaughlin for the use of excessive force and deliberate indifference to health and safety in violation of Plaintiff's Eighth Amendment rights in relation to the use of handcuffs. Initial Review Order 15, ECF No. 19. The Court dismissed all other claims and all other defendants. *Id*.

On December 9, 2025, after the close of discovery, Defendant filed the instant Motion. *See* Mot.; Scheduling Order, ECF No. 49. Thereafter, Plaintiff filed his response in opposition, *see* Pl.'s Opp.,[9] to which Defendant filed a reply brief, *see* Reply Pl.'s Opp. Mot. Summ. J., ECF No. 79.

**Discussion**

Plaintiff brings claims of excessive force and deliberate indifference to his health and safety under the Eighth Amendment. Excessive force and deliberate indifference claims fall under the Eighth Amendment's protection against cruel and unusual punishment. *See Hudson v. McMillian*, 503 U.S. 1, 5–6 (1992). However, the standard courts apply to determine whether conduct amounts

---

[9] In his opposition brief, Plaintiff alleges, for the first time, spoliation of evidence. Specifically, Plaintiff claims that on February 26, 2024, he contacted Intel Coordinator Captain Wright "to request video preservation of the entire day of the shakedown on February 20, 2024." *Id.* at 13. He alleges that while he was provided some responsive footage, "the video footage preserved and provided to him via discovery does not display specific facts raised in his [C]omplaint." *Id.* Specifically, he claims the video does not show him receiving medical treatment or "asking Defendant … for medical treatment." *Id.*

To the extent Plaintiff seeks sanctions for spoliation of evidence, he must establish three elements: "(1) that the party having control over the evidence had an obligation to preserve it at the time it was destroyed; (2) that the records were destroyed with a culpable state of mind; and (3) that the destroyed evidence was relevant to the party's claim … such that a reasonable trier of fact could find that it would support that claim." *Residential Funding Corp. v. DeGeorge Fin. Corp.*, 306 F.3d 99, 107 (2d Cir. 2002) (quotation marks omitted). And it is axiomatic that, in order for Plaintiff to establish the records have been destroyed, he must first show they existed. Here, Plaintiff has not established that the subject evidence existed. Accordingly, his spoliation argument fails.

to "cruel and unusual punishment" depends on the nature of the violation alleged. "[T]he appropriate inquiry when an inmate alleges that prison officials failed to attend to serious medical needs is whether the officials exhibited 'deliberate indifference.'" *Id.* (quoting *Estelle v. Gamble,* 429 U.S. 97, 104 (1976). By contrast, whether a defendant is liable for excessive force "turns on 'whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm.' " *Id.* (*Whitley v. Albers*, 475 U.S. 312, 320–21 (1986)).

In either instance, to succeed on his claim, Plaintiff must satisfy both a subjective and an objective component. *See Bradshaw v. City of New York*, 855 F. App'x 6, 9 (2d Cir. 2021) (quoting *Harris v. Miller*, 818 F.3d 49, 63, 64 (2d Cir. 2016)) (holding plaintiff bringing an excessive force claim must establish "the defendant acted with a subjectively sufficiently culpable state of mind' and 'that the conduct was objectively harmful enough or sufficiently serious to reach constitutional dimensions'"); *Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998) ("The standard of deliberate indifference includes both subjective and objective components."). In moving for summary judgment, Defendant argues, *inter alia*, that Plaintiff's deliberate indifference and excessive force claims fail as a matter of law because Plaintiff cannot establish the subjective component of either claim. *See* Mot.; Mot. Br.[10]

<u>Deliberate Indifference Claim</u>

To succeed on his Eighth Amendment claim for deliberate indifference to health and safety, a plaintiff must show the defendant "kn[ew] of and disregard[ed] an excessive risk to [the plaintiff's] health or safety." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994). Such a showing not

---

[10] Defendant also argues that the Court should grant summary judgment because Plaintiff cannot establish the objective element of either claim, or, alternatively, because Defendant is entitled to qualified immunity. *See* Mot.; Mot. Br. The Court need not reach the merits of these arguments to find in favor of Defendant.

only requires evidence that the defendant was "aware of facts from which the inference could be drawn that a substantial risk of serious harm exists," but also that he drew the inference. *Id.* However, where a prison official knows a risk to inmate health or safety exists, he "may be found free from liability" if he "responded reasonably to the risk, even if the harm was not averted." *Lewis v. Siwicki*, 944 F.3d 427, 433 (2d Cir. 2019) (quoting *Lewis v. S[i]wicki*, No. 3:13cv495 (DJS), 2017 WL 4286300 (D. Conn. Sept. 27, 2017)).

To the extent Plaintiff argues Defendant acted with deliberate indifference to his medical needs by initially handcuffing him behind the back, he has not offered sufficient evidence to place the issue in genuine dispute. Although Defendant was aware Plaintiff suffered from a preexisting injury which would be exacerbated by being handcuffed from behind, the evidence before the Court does not show that Defendant was aware that the risk of harm was substantial. Plaintiff did not have a medical pass exempting him from being handcuffed behind the back and Defendant did not have access to Plaintiffs' medical records to corroborate his complaints. And, even if Defendant was aware that the risk of harm was substantial, Plaintiff has not submitted sufficient evidence that Defendant failed to take reasonable action to abate or avert the harm. Indeed, Defendant "double-cuffed" Plaintiff to accommodate Plaintiff's injury. *See Bryans v. Cossette*, No. 3:11-CV-01263 JCH, 2013 WL 4737310, at *11 (D. Conn. Sept. 3, 2013) (concluding defendant was not deliberately indifferent to serious medical need where defendant loosened handcuffs within thirty minutes). To the extent that this technique may not have been the optimal means of avoiding discomfort,[11] the undisputed evidence demonstrates Defendant was not made

[11] In his counterstatement of material fact, Plaintiff submits that "double-cuffing is not "an authorized practice" or "standard operating procedure." Opp. Br. 28. Accordingly, Plaintiff states Defendant should have used other options, such as "flex cuffs, soft restraints, chub cuffs[,] or belly chains" or he could have had him "front-cuffed." *Id.* However, the evidence Plaintiff submits – portions of his own deposition testimony regarding his own preferences and a non-exhaustive list of types of hand restraints – is insufficient to substantiate this contention. *See id.* at 85, 160–65.

aware that the accommodation did not achieve its intended purpose until after Plaintiff was returned to his cell.

Insofar as Plaintiff's claim is premised on Defendant's alleged failure to provide him with proper medical care, he has similarly failed to meet his burden as to the subjective component of his claims. "Although medical deliberate indifference claims are most often asserted against medical personnel," non-medical prison personnel may be held liable for deliberate indifference where the plaintiff establishes "prison personnel intentionally delayed access to medical care when the inmate was in extreme pain and has made his medical problem known to the attendant prison personnel." *Dailey v. Fuller*, No. 915CV01051BKSTWD, 2016 WL 7732236, at *9 (N.D.N.Y. Dec. 5, 2016), *R. & R. adopted*, 2017 WL 108056 (N.D.N.Y. Jan. 11, 2017) (quoting *Hodge v. Coughlin*, No. 92 Civ. 0622(LAP), 1994 WL 519902, at *11 (S.D.N.Y. Sept. 22, 1994), *aff'd*, 52 F.3d 310 (2d Cir. 1995)) (citing *Baumann v. Walsh*, 36 F. Supp. 2d 508, 512 (N.D.N.Y. 1999); *Estelle v. Gamble*, 429 U.S. 97, 104-05 (1976)). Here, although Plaintiff's evidence shows that he alerted other prison personnel to his medical needs while in the multi-purpose room, he has not shown Defendant was aware of Plaintiff's continued discomfort during that time. Instead, the record indicates Defendant did not become aware that Plaintiff remained uncomfortable despite Defendant's adjustments until after Plaintiff was returned to his cell. After Plaintiff directly asked Defendant for medical attention, he was seen by a unit nurse within minutes.

Defendant having met his burden to establish that there is no genuine issue of material fact as to the subjective component of the deliberate difference claim, it becomes Plaintiff's burden to point to evidence that creates such an issue of fact. For the reasons discussed, the Court finds that Plaintiff has not met this burden.

<u>Excessive Force Claim</u>

Just as Plaintiff failed to show a genuine dispute of fact as to whether Defendant acted with deliberate indifference, so too was he unable to demonstrate an issue of fact as to whether Defendant acted with the requisite malice. *Wilkins v. Gaddy*, 559 U.S. 34, 39 (2010) (quoting *Hudson*, 503 U.S. at 9) (citing *Whitley*, 415 U.S. at 319–321). In considering the subjective element of an excessive force claim, courts consider "the need for application of force, the relationship between that need and the amount of force used, the threat 'reasonably perceived by the responsible officials,' and 'any efforts made to temper the severity of a forceful response.'" *Hudson*, 503 U.S. at 7 (quoting *Whitley*, 475 U.S. at 321).

Here, the undisputed facts establish Defendant's decision to handcuff Plaintiff behind his back was undertaken to further the legitimate purpose of maintaining prison safety. Defendant was assigned to supervise the shakedown of the Alpha Unit, during which he and other prison personnel canvassed for drugs, weapons, and contraband in the inmate's housing unit. In compliance with safety protocols set in place to protect both the inmate population and prison personnel during those searches, Defendant worked to ensure all inmates were handcuffed uniformly during the searches. Because "[m]aintaining order and security in a prison is a legitimate penological objective … the use of restraints that are reasonably related to maintaining prison order and security, without more, does not violate the Eighth Amendment." *Shehan v. Erfe*, No. 3:15-CV-1315 (MPS), 2017 WL 53691, at *9 (D. Conn. Jan. 4, 2017) (citing *Dolphin v. Manson*, 636 F. Supp. 229, 234 (D. Conn. 1986)).

In the context of an excessive force claim involving handcuffs, the Second Circuit has held that "a plaintiff … need not always establish that she alerted an officer to the fact that her handcuffs were too tight or causing pain," but must, at minimum, show that the "officer reasonably should have known during handcuffing that his use of force was excessive." *Cugini v. City of New York*,

941 F.3d 604, 613 (2d Cir. 2019). As addressed, Defendant's evidence demonstrates that when Plaintiff alerted him of his initial discomfort and concerns regarding his arm injury, Defendant took steps to mitigate the harm the handcuffs might cause. And, even if his discomfort persisted while he was restrained using the double-cuff technique, Plaintiff failed to show Defendant was aware of his continued discomfort. As reiterated, upon learning that the adjustments made were insufficient to alleviate his pain, Defendant obtained medical treatment for Plaintiff.

In sum, the undisputed facts demonstrate that Defendant acted to balance Garner's legitimate safety objectives against Plaintiff's individual medical needs and timely responded to the complaints of which he was made aware. Accordingly, the Court finds that the record does not establish that there is a genuine dispute as to whether Defendant acted with a sufficiently culpable state of mind as to the excessive force claim. *See Warren v. Purcell*, No. 03 CIV. 8736 (GEL), 2004 WL 1970642, at *8 (S.D.N.Y. Sept. 3, 2004) (dismissing plaintiff's excessive force claim where plaintiff failed to allege any improper or wanton motive for officer's actions, made no allegation that officers deliberately placed handcuffs on him too tightly, and had alleged that when he first complained of discomfort, the officer readjusted plaintiff's position in response).

As no reasonable jury could determine after reviewing the present record that Defendant was deliberately indifference to Plaintiff's health and safety needs or used excessive force, summary judgment must be granted in Defendant's favor.

**Conclusion**

For the foregoing reasons, Defendant's motion for summary judgment, ECF No. 71, is **GRANTED**. Accordingly, the Clerk is directed to enter judgment for Defendant and close this case.

**SO ORDERED** at Bridgeport, Connecticut, this 1st day of October 2026.

*/s/ Kari A. Dooley*
KARI A. DOOLEY
UNITED STATES DISTRICT JUDGE